| | | |
|---|---|---|
| TRIP MATE, INC., formerly known as Trip Mate Agency, Inc., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 10-0793-CV-W-ODS |
| STONEBRIDGE CASUALTY INSURANCE COMPANY, et al., | ) ) ) ) | |
| Defendants. | ) ) | |
| UNIQUE VACATIONS, INC., | ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 11-1097-CV-W-ODS |
| TRIP MATE, INC., formerly known as Trip Mate Agency, Inc., and STONEBRIDGE CASUALTY COMPANY, | ) ) ) ) ) ) | |
| Defendants. | ) | |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT

This case involves the consolidation of two lawsuits. In one, Unique Vacations ("Unique") asserts Trip Mate and Stonebridge Casualty Company ("Stonebridge") breached a contract. Trip Mate and Stonebridge filed cross-claims, alleging the other is liable for any amounts they may owe to Unique. In the other suit Trip Mate asserts Stonebridge breached a contract or is liable under a theory of unjust enrichment for amounts Trip Mate paid to Avanti Destinations ("Avanti"), who is not a party to this suit. As detailed below, the Court concludes:

1. Trip Mate is liable to Unique.
2. Stonebridge is not liable to Unique.
3. Stonebridge is liable to Trip Mate.

## I. BACKGROUND

A bench trial was held on April 1 and 2 of this year. In addition to testimony and other evidence offered at trial, the parties submitted testimony from a number of witnesses via depositions. The Court has considered all of the evidence presented and makes the following factual findings, all of which are supported by the preponderance of the evidence. The Court has pointed to portions of the Record supporting some of its factual findings, primarily when the support comes from depositions. However, the parties are assured the Court has considered the entire Record, and that any contradictions and other factual disputes have been resolved consistent with the Court's findings. The parties are also advised the Court has not specifically identified each and every portion of testimony or piece of evidence that supports its factual findings.

In early 1989, Trip Mate began doing business in the travel insurance industry. Trip Mate is not an insurance company: generally speaking, it has the right – on behalf of the insurer – to market, administer, and sell (or bestow) the right to sell travel insurance policies. As relevant to this suit, Trip Mate enters contracts with Travel Organizers, which are businesses that combine various aspects of a travel package (transportation, lodging, etc.) for sale to the general public. The contract between Trip Mate and a Travel Organizer ("TO") is known as a Travel Organization Agreement ("TOA"). The TOA authorizes the TO to offer the traveler the option of buying travel insurance issued by the insurer. The TOA specifies the premium that must be collected and remitted to Trip Mate, and the TO is permitted to add an additional amount to cover its expenses and provide it with profit. Upon collecting the purchase price from the traveler, the TO retains the amount exceeding the premium and remits the premium to Trip Mate. Trip Mate maintains all premiums in a Premium Trust Account where (as the account's name suggests) Trip Mate keeps the funds in trust for the insurer. Claims were paid out of a separate account that was funded by the insurer.

Since its inception and until November 2009, Trip Mate operated on behalf of various insurance entities from a "family" of insurance companies known as the AEGON Group. The last such insurer/entity was Stonebridge Casualty Insurance Company

("Stonebridge"), and for the sake of consistency and clarity the Court will use that name for the insurance company (mindful that, in a given instance, the reference really should be to a different member of the AEGON family). In 1997, Stonebridge purchased Trip Mate; in March 2004, Trip Mate's founders re-purchased the company and simultaneously entered a Managing General Agent Agreement ("MGA") with Stonebridge. The MGA continued in effect until the parties terminated their relationship in November 2009.

The MGA grants Trip Mate the power "to market, underwrite, and service the travel insurance policies" for Stonebridge, subject to Stonebridge's right to review and approve advertisements and forms of contract. MGA, Article A.1. Premiums were to be approved by Stonebridge, and Trip Mate was responsible for collecting those premiums. MGA, Article B.2. Once collected, premiums were to be placed in the aforementioned Premium Trust Account. MGA, Article C.2. Within thirty days of the end of each month, Trip Mate was to remit all funds in the Premium Trust Account to Stonebridge, "net of the agreed compensation determined by [Trip Mate and Stonebridge] to be paid to [Trip Mate] for each specific Travel Program placed with [Stonebridge] for the services performed under the terms of" the MGA. MGA, Article C.3. In accordance with this limitation, the MGA later defines three circumstances in which Trip Mate could use funds from the Premium Trust Account to pay Stonebridge's debts. The parties agree the third circumstance in not relevant to these proceedings and will not be discussed further. The two circumstances at issue are (1) to "make refund of premiums to persons entitled to them" and (2) to pay the agreed compensation for Trip Mate's Services. MGA, Article C.4.

Trip Mate's compensation was addressed in a separate document and is not specified in the MGA. MGA, Article F.1. The MGA specifies Trip Mate "is responsible for paying all commissions or fees that may be due Marketing Representatives from the compensation paid to" Trip Mate. MGA, Article F.2. Trip Mate was also "responsible for all administrative expenses" it incurred "in connection with the solicitation, marketing . . . sale, and administration of the Policies written under this Agreement. [Stonebridge] shall

3

be responsible only for the expenses it has specifically agreed to assume as set forth under" the MGA.   MGA, Article F.3.

Sometime in the 1990s Trip Mate began making profit sharing available to a small number of TOs.   If the claims made by the TO's customers fell below a certain percentage of the net premium, the TO received a portion of that difference.   For instance, if the threshold was 75% of the net premium and the profit sharing percentage was 85%, then the TO would receive 85% of the difference between 75% of the premium and the claims actually made by travelers.   Trip Mate first made profit sharing available to certain TOs in the 1990s, before Stonebridge purchased Trip Mate in 1997.   The practice of offering profit sharing to certain TO's continued after Stonebridge purchased Trip Mate and after Stonebridge sold Trip Mate back to the founders.

The profit sharing was disseminated to TO's in two steps.   First, Trip Mate frequently made an estimated payment of profit sharing.   It was able to make these estimates because under the MGA Trip Mate was also responsible for administering claims on behalf of Trip Mate, so Trip Mate knew whether claims by a particular TO's customers fell below the necessary threshold.   A subsequent payment was made to provide the full amount due to the TO.   Both the estimated payment and the final payment were made from the Premium Trust Account.   The profit sharing payments out of the Premium Trust Account were reflected in the monthly reports Trip Mate provided to Stonebridge.   More specifically, those reports identified both the fact and the amount of the profit sharing taken out of the Premium Trust Account, and this information was reported for each TO.   This is persuasively demonstrated by the reports themselves (many of which were admitted as exhibits) as well as the testimony offered at trial.   E.g., Tr. at 74, 84-87, 92-94, 160-61 (testimony of Bradley Finkle).   Funds taken out of the Premium Trust Account to pay profit sharing were placed in a Trip Mate account, and the money was then disbursed to the TOs.   Critically – and contrary to Stonebridge's position – profit sharing payments were separate and apart from the payments made from the Premium Trust Account that constituted Trip Mate's compensation.   Put another way,

Case 4:10-cv-00793-ODS   Document 178   Filed 04/16/13   Page 4 of 14

these payments and entries were clearly not part of the "agreed compensation" referenced in Articles C and F of the MGA.[1]

The Court also finds Stonebridge understood what the monthly reports divulged about the existence and the amount of profit sharing, including the fact that the profit sharing payments were not counted as part of Trip Mate's compensation. For instance, the Court notes the testimony (submitted via deposition) of Jeffrey Davidson. He described an April 2004 meeting with Trip Mate where he asked if any profit sharing payments were due to any TOs. Davidson Dep. at 15-16. He asked the question because "a year prior we had been notified that there were profit sharing payments that had been made by Trip Mate" and he was investigating to determine whether those payments increased Trip Mate's commissions. Davidson Dep. at 17. Davidson learned of the prior profit sharing payments from Stonebridge's finance department, which itself learned of the profit sharing payments after reviewing Trip Mate's monthly statements documenting activity in the Premium Trust Account. Davidson Dep. at 37-38. Davidson's questions were answered during that 2004 meeting, and he understood (as reflected in the monthly statements Trip Mate submitted) that Stonebridge's profits were affected by the profit sharing because they represented expenses of the program. Davidson Dep. at 19, 34-35. Other evidence supports the conclusion that Stonebridge was aware not only of the profit sharing, but the source of funds for the profit sharing. E.g., Tr. at 179, 185 (testimony of Finkle); Tr. at 196-97, 204-05 (testimony of Robert Currie).

The Court rejects as incredible all testimony intimating that Stonebridge did not know or understand that profit sharing existed or how it was paid. The reports submitted to Stonebridge clearly divulged that profit sharing was paid out of premiums that would otherwise have been remitted to Stonebridge. Those same reports demonstrate the profit sharing was not counted as part of Trip Mate's "regular" compensation.

---

[1] While this is not the sole basis for the Court's conclusion, it should be noted that if Stonebridge's position is correct then the Court would have to believe that Trip Mate overpaid itself for years with Stonebridge's knowledge, yet Stonebridge did nothing to correct the practice. The Court does not interpret the evidence in this manner.

Nonetheless, nobody at Stonebridge admits to understanding (or caring) that Stonebridge was effectively paying the profit sharing to the TOs. For instance, Davidson testified he could not say whether the profit sharing was ultimately paid by Trip Mate or Stonebridge. Davidson Dep. at 35-36.[2] Stewart Allderige testified the reports from Trip Mate documented the gross premium, subtractions from the gross premium, and the net premium, and that profit sharing constituted a reduction to the net premium. Allderige Dep. at 7, 10-11, 19-20. In addition to receiving the monthly reports, Stonebridge audited Trip Mate approximately every eighteen months – yet never raised any issue regarding the profit sharing payments from the Premium Trust Account. Tr. at 104-05.

Trip Mate and Stonebridge terminated their relationship in November 2009, and memorialized the termination in a written document. Section 6 of the Termination Agreement specifies that Articles C, D, and E of the MGA survived the termination.

Avanti's TOA had a profit sharing provision that existed as early as 2004. The previously-mentioned reports from Trip Mate disclosed to Stonebridge the existence of and the accounting for the profit sharing payments. In July 2010, Trip Mate calculated the amount of profit sharing that would due to Avanti for 2009; that figure exceeded $146,000. There is no suggestion that the calculation is incorrect. However, there were not sufficient funds in the Premium Trust Account to pay this amount, so Trip Mate paid $100,000 to Avanti out of its own funds. Trip Mate has sought reimbursement of this sum from Stonebridge, but Stonebridge has declined to pay because it believes the obligation to pay profit sharing is Trip Mate's and not Stonebridge's. At issue in this case is whether Trip Mate is entitled to reimbursement of the $100,000 payment from Stonebridge

Starting in late 2004, Unique's TOAs began including a profit sharing provision. The amount owed to Unique is $324,827.30. There were not sufficient funds in the Premium Trust Account to pay Unique, and Trip Mate opted not to pay Unique. There are two issues relating to Unique: (1) whether Trip Mate, Stonebridge, or both are liable

---

[2]While not designated by the parties, Davidson reiterates these points on page 53 of his deposition.

Case 4:10-cv-00793-ODS   Document 178   Filed 04/16/13   Page 6 of 14

for that amount, and (2) if only Trip Mate is liable to Unique, whether Stonebridge is liable to Trip Mate.

## II.  DISCUSSION

### A.  Who is Liable to Unique?

For ease of discussion, the Court will begin with the easiest issue: who is liable to Unique?  There are only two parties to the TOA: Trip Mate and Unique.  The TOA clearly states it is an agreement between Trip Mate and the TO (in this case, Unique). The Court thus concludes Trip Mate is obligated to pay the profit sharing to Unique. However, the Court rejects Unique's request for an award of prejudgment interest pursuant to section 408.020 of the Revised Missouri Statutes.  A prerequisite for an award under that section is a demand by the creditor/plaintiff upon the debtor/defendant. Unique points to Trip Mate Exhibit 24 to demonstrate this requirement was fulfilled. However, Exhibit 24 is a letter from Trip Mate to Stonebridge.  It is not a demand from Unique and it is not a demand made to Trip Mate.  Therefore, prejudgment interest is not justified.

The critical question is whether Stonebridge is also obligated to Unique.  Under the TOA, Trip Mate authorizes Unique "to make available Travel Insurance policies underwritten by [Stonebridge] and administered by Trip Mate" subject to terms and conditions specified in the TOA.  The sequence or chain of events can be described as follows: (1) by entering the MGA with Trip Mate, Stonebridge gave Trip Mate the right to sell insurance contracts issued by Stonebridge, and (2) by entering the TOA with Unique, Trip Mate gave Unique the right to sell its customers insurance contracts issued by Stonebridge.  This arrangement does not make Stonebridge a party to the TOA (nor does it make Unique a party to the MGA).

This is consistent with the extent of Trip Mate's powers under the MGA.  The only contract Trip Mate could enter on behalf of Stonebridge was a contract to sell insurance policies; those policies obligated Stonebridge to provide insurance coverage to the

7

purchaser, which would be the traveler.  If Stonebridge failed to pay on a policy, then the traveler (but not the TO) would have a breach of contract claim – because only the traveler was insured, and only the traveler was owed an obligation from Stonebridge. While Trip Mate had the authority to market, underwrite, and service the policies, it had no authority to bind Stonebridge to any contract other than the insurance policies themselves.

Unique argues Trip Mate had actual authority to bind Stonebridge to the TOA. The preceding analysis explains why this is not true.  Given that (1) actual authority was created, if at all, by the MGA and (2) the MGA is governed by Maryland law, the Court analyzes the issue of actual authority through the lens of Maryland law.  Actual authority is created by written or spoken words or other conduct which reasonably causes the agent to believe the agent is authorized to act on the principal's behalf.  E.g., Dickerson v. Longoria, 995 A.2d 721, 735 (Md. 2010).  The scope of authority includes the authority explicitly granted and extends to those powers implied by the explicit grant of authority. Department of Public Safety & Correctional Services v. ARA Health Services, Inc., 668 A.2d 960, 968-69 (Md. Ct. Spec. App. 1995).  Nothing in the MGA explicitly gave Trip Mate authority to bind Stonebridge to the TOA, and the power to promise profit sharing was not *necessary* and incidental to the powers expressly granted to Trip Mate under the MGA.   While acquiescence in the agent's actions can sometimes expand the agent's authority, Dickerson, 995 A.2d at 735, the Court holds this did not happen here because the TOA does not indicate Stonebridge is supposed to pay the profit sharing – so while Stonebridge may have acquiesced in the TOA, doing so did not expand Trip Mate's authority to permit it to obligate Stonebridge to pay the profit sharing.  Moreover, even if actual authority existed, Trip Mate did not sign the TOA on behalf of Stonebridge and thus did not purport to act in its capacity as an agent.  Instead, Trip Mate executed the TOA in its own capacity.

To clarify the Court's holding, the Court is not suggesting Trip Mate lacked the authority to enter the profit sharing agreements with TOs.  Such authority arguably exists as part of Trip Mate's authority to market and administer the policies.  However, that

power did not include the authority to bind Stonebridge to any contracts made in the course of marketing the policies.

As an alternative position, Unique contends Trip Mate had apparent authority – or is estopped from denying Trip Mate's authority – to enter profit sharing agreements on Stonebridge's behalf. Apparent authority and agency by estoppel depend on the principal's representations, communications, and manifestations to a third party, not (as with the case of actual authority) to the agent. E.g., Johns Hopkins Univ. v. Ritter, 689 A.2d 91, 96 (Md. Ct. Spec. App. 1996); Security Union Title Ins. Co. v. Citibank, Fl., 715 So.2d 973, 975 (Fla. Dist. Ct. App. 1998).[3] An agent acts with apparent authority when the apparent principal manifests consent to the exercise of authority, a person relied on the facts and had reason to believe (and actually believed) the agent possessed such authority, and the third-party relying on the appearance of authority acted to his detriment. E.g., Hobdey v. Wilkinson, 94 A.2d 625, 629 (Md. 1953); Jackson v. 2109 Brandywine, LLC, 952 A.2d 304, 322 (Md. Ct. Spec. App. 2008); Roessler v. Novak, 858 So.2d 1158, 1161-62 (Fla. Dist. Ct. App. 2003); Radison Properties, Inc. v. Flamingo Groves, Inc., 767 So.2d 587, 590 (Fla. Dist. Ct. App. 2000).

Unique argues that Stonebridge's acquiescence in the profit sharing arrangements manifested approval of Trip Mate's actions on its behalf. The Court disagrees. First, Unique was not aware of Stonebridge's acquiescence because Unique never communicated with Stonebridge. In addition, the facts do not demonstrate Trip Mate (or anyone else) said anything suggesting Trip Mate was obligating Stonebridge to pay the profit sharing, so Stonebridge's actions (even if known to Unique) cannot be deemed acquiescence to Trip Mate's exercise of authority to bind Stonebridge.

---

[3]Apparent authority and agency by estoppel depend on representations made to Unique, so the MGA's choice of law provision should not govern. In an abundance of caution, and because the law is the same in either event, the Court has cited Maryland law (because that is the place of Stonebridge's principal place of business) and Florida (because that is the place of Unique's principal place of business).

9

## B. Is Stonebridge Liable to Trip Mate?

Trip Mate's claims regarding its payment to Avanti and its obligation to Unique both turn on the answer to the following question: as between Stonebridge and Trip Mate, who is ultimately responsible for paying the profit sharing? Stonebridge contends profit sharing is an expense of Trip Mate's that must come out of Trip Mate's compensation, while Trip Mate contends it is to be paid out of the premiums collected for and otherwise due to Stonebridge. The parties begin by presenting different interpretations of the MGA and the Termination Agreement, but the Court is not persuaded either party's position should prevail.

Both the MGA (in Article J.4) and the Termination Agreement (in Section 14.7) state they are governed by Maryland law. Numerous Maryland cases establish that "[t]he cardinal rule of contract interpretation is to give effect to the parties' intentions." E.g., Tomran, Inc. v. Passano, 891 A.2d 336, 344 (Md. 2006). The starting point for ascertaining that intent is the parties' written agreement, and the language therein is to be given its customary and ordinary meaning. E.g., Ocean Petroleum Co. v. Yanek, 5 A.3d 683, 690 (Md. 2010). However, if the contract is reasonably susceptible to more than one interpretation, an ambiguity arises. In that case, the parties' intent can be ascertained through the use of extrinsic evidence. E.g.,100 Investment Ltd. Partnership v. Columbia Town Center Title Co., 60 A.3d 1, 22-23 (Md. 2013).

As stated earlier, Section 6 of the Termination Agreement specifies that Article C of the MGA survives the termination. This is significant because Article C addresses various aspects of "Premium Collection," including the proper disposition of funds in the Premium Trust Account. Article C.4 says that Trip Mate "may make disbursements from the Premium Trust Account on behalf of [Stonebridge] to pay (a) amounts necessary to make refund of premiums to persons entitled to them [and] (b) the amount which represents the agreed compensation for [Trip Mate's] services."[4]

---

[4] As stated earlier there is a third permitted disbursement, but all parties agree that it is not germane to this case.

10

### *1. The Refund Provision*

Trip Mate argues the profit sharing constituted a "refund of premium." The Court disagrees because profit sharing does not refund the premium to the party who paid it. Travelers/customers paid the premium (plus additional charges) to the TO; the premium passed through the TO, which remitted it to Trip Mate; Trip Mate held it in trust to be paid to Stonebridge (subject to any disbursements permitted by the MGA). A refund of the premium, then, would be expected to find its way back in the hands of the traveler because it is the traveler that actually paid the premium – but of course, the proceeds of profit sharing go to the TO and are not returned to the traveler. The TO physically remits the traveler's payment but it does not remit funds of its own, so the profit sharing is not a "refund." Nothing is "refunded" to the TO, so categorizing profit sharing paid to the TO as a "refund of premium" is inconsistent with the customary and ordinary understanding of that concept.

The evidence at trial supports this understanding: travelers had certain rights to cancel their policies, and when they did so they would be due a refund of the premium they paid. In other cases, a traveler might be incorrectly charged. In these circumstances, Trip Mate took the premium (or other amount due to the traveler) from the Premium Trust Account and returned it to the TO, which was then obligated to return the money to the traveler. These are the circumstances the parties intended to be covered by Article C.4's reference to "refund of premiums to persons entitled to them," and they did not intend that phrase to apply to profit sharing.

### *2. The Compensation Provision*

Stonebridge contends the profit sharing was to be paid out of Trip Mate's compensation in accordance with Article C.5, which dictates that Trip Mate (and not Stonebridge) is responsible for compensation due to agents, brokers, or producers. As a predicate to this argument, Stonebridge has gone to great lengths to establish that TOs are "agents, brokers, or producers" so any payments owed to them are covered by Article

11

C.5.  The Court has no doubt that Stonebridge sincerely believes these propositions – now.  The Court also believes Stonebridge's argument *might* have carried some force when Trip Mate first started paying profit sharing out of funds otherwise due to Stonebridge.  However, the Court holds that by knowingly allowing Trip Mate to pay profit sharing out of funds otherwise due to Stonebridge for more than a decade, Stonebridge effectively agreed to an amendment of Article C.5 by creating an additional circumstance under which payments from the Premium Trust Account were permitted.

Under Maryland law, a contract may be modified by the subsequent conduct of the parties.  E.g., University Nat'l Bank v. Wolfe, 369 A.2d 570, 576 (Md. 1977), Cole v. Wilbanks, 171 A.2d 711, 712 (Md. 1961); Fantle v. Fantle, 782 A.2d 377, 382 (Md. Ct. Spec. App. 2001); Mercantile-Safe Deposit & Trust Co. v. Delp & Chapel Concrete & Constr. Co., 408 A.2d 1043, 1048 (Md. Ct. Spec. App. 1979).  The determination of whether such a modification has occurred is a question of fact.  E.g., Wolfe, 369 A.2d at 576; Berringer v. Steele, 758 A.2d 574, 608 (Md. Ct. Spec. App. 2000).  Such a modification can occur even if the parties explicitly agreed that amendments could only be made in writing, because such a requirement can be waived by the conduct of the parties.  E.g., Hovnanian Land Inv. Group, LLC v. Annapolis Towne Centre at Parole, LLC, 25 A.3d 967, 983-84 (Md. 2011); Wolfe, 369 A.2d at 576.

Beginning sometime in the early 1990s, Trip Mate began making profit sharing available to some TOs.  From the beginning, it paid profit sharing out of the Premium Trust Account separate and apart from its "regular" compensation.  Reports documenting this practice were submitted to Stonebridge.  The reports were received by Stonebridge, and the reports were understood by Stonebridge.  Stonebridge audited the Premium Trust Account on a regular basis.  Stonebridge asked Trip Mate about the profit sharing program.  Stonebridge was fully aware of how the profit sharing worked, including the critical fact that the profit sharing was paid out of the Premium Trust Account with money that would have otehwise gone to Stonebridge and was *not* paid out of Trip Mate's regular compensation.  It must also be remembered that this practice (and necessarily, knowledge of it) persisted while Stonebridge owned Trip Mate.  Despite

being armed with this knowledge and understanding of the profit sharing arrangement, Stonebridge did nothing for more than a decade.

Assuming for the sake of argument that the MGA as written would have required Trip Mate to pay profit sharing out of its compensation, Stonebridge's knowing acquiescence in Trip Mate's actions constituted its agreement to modify the MGA. Specifically, Stonebridge effectively agreed profit sharing was a debt it would pay out of its share of the premiums. This amendment adds a new circumstance in which Trip Mate was permitted to pay funds out of the Premium Trust Account. Through its conduct, Stonebridge agreed to bear the ultimate financial responsibility for the profit sharing.[5] This amendment to Article C survived the Termination Agreement along with the rest of Article C, so Stonebridge still bears financial responsibility for the profit sharing payments. Thus, it is obligated to (1) reimburse Trip Mate for the $100,000 already paid to Avanti and (2) reimburse Trip Mate for the $324,827.30 owed to Unique.[6]

The Court's conclusion is not affected by Article F.1 of the MGA, the last sentence of which declares "[n]o change or modification can be made to the designated compensation levels set forth in writing without [the parties'] written approval." Similarly, Article J.9, a provision that purports to prohibit waivers, does not affect the Court's conclusion. As mentioned earlier, these provisions are themselves subject to waiver. Here, the Court finds that these provisions – and any others that might be construed as prohibiting the amendment described above – were waived. Given (1) the clarity with

---

[5] It does not matter to the outcome, but the Court does not hold Stonebridge's conduct modified the meaning of the term "refund." It is one thing for a party's conduct to modify the MGA but it is quite another to hold that a party has modified a contractual term so that it means something other than its ordinary meaning. Moreover, the reports documenting activity in the Profit Sharing Account are best understood as paying or reimbursing Trip Mate for the profit sharing payments and not as evidencing a refund of premiums.

[6] In its post-trial filing, Trip Mate suggested it is entitled to attorney fees pursuant to Article J.10 of the MGA. There are several reasons to reject this claim, including (1) Article J did not survive the Termination Agreement and (2) Trip Mate did not present any evidence at trial to substantiate the amount to be awarded for this component of damages.

13

which Trip Mate reported its actions, (2) Stonebridge's actual understanding, and (3) the length of time Stonebridge possessed that actual understanding, the Court concludes Stonebridge waived any of its contractual rights to insist that amendments (both as a general matter and those addressing Trip Mate's compensation specifically) be in writing.

### III.  CONCLUSION

1. On Unique's claim against Stonebridge, the Court finds in favor of Stonebridge.
2. On Unique's claim against Trip Mate, the Court finds in favor of Unique and enters judgment in the amount of $324,827.30.
3. On Trip Mate's claim against Stonebridge, the Court finds in favor of Trip Mate. The Court enters judgment in favor of Trip Mate and against Stonebridge in the amount of $100,000, and holds Stonebridge must indemnify Trip Mate for the $324,827.30 judgment described in the preceding numbered paragraph.

IT IS SO ORDERED.

DATE: April 16, 2013

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT